May it please the court, Lisa Bennett for the State of Texas Petitioners. EPA's final rule is the epitome of a locally or regionally applicable rulemaking with a local or regional scope and effect. That scope and effect is focused in Texas and to a much lesser extent Oklahoma, a far from nationwide. The local or regional character of this rulemaking is plain from the structure and process of the rulemaking. EPA held hearings only in Austin, Texas and Oklahoma City, Oklahoma, not in D.C. as it typically does for a nationwide rulemaking. No other states commented on the rule and they had no reason to think they should. It was entitled Approval and Promulgation of State Implementation Plans for Texas and Oklahoma and that is indeed the content of the rule. Counsel, let me ask you where you are, how you fit this in within the statute. I want you to identify some things for me and for me to see the relevance of what you're arguing. Looking at what the parties have apparently agreed are the three ways to break down 7607 B.1 and however many other subparts there are. D.C. Circuit only, if such action, what's the action in this case? So the action here was partial disapproval and partial approval of the Texas SIP. Okay, so that's the action. I know I'm cutting you off, I just want some short answers to this, I'm trying to be respectful of your time. If such action is based on a determination, what is the determination in your mind? So the determinations upon which those actions could be based are EPA's justifications for taking those actions. So we listed a number of quotes in the letter brief that we submitted. Well, where do we find the relevant determination? Wouldn't it be in what they found and published, which is the 81 Federal Register of Pages? Correct. So you look in 81 Federal Register and on numerous occasions EPA identifies determinations it made. For example, it determined that Texas's four-factor analysis was inadequate and that was the basis on which they took the action of disapproving portions of the SIP regarding the reasonable progress goals. Okay, so when you, I stopped you on your argument, but you're talking generally, it seems to me, about the ruling that they made regarding the eight power plants in Texas and how the regional HAZE rule should be implemented there, but it seems to me that you're right, that the action that the determination we're looking at is not whether that ruling had nationwide scope or effect, but whether some of these underlying determinations regarding, and they named two sections of the Clean Air Act in their findings, and they said we made new determinations about, I'm drawing a blank right now, 110A and what it said and 169 or some such numbers like that. Is that right? Is that what we should be looking at insofar as the determinations are concerned and whether those had nationwide scope? That is what EPA urges you to look to, but those clarifications are not in the final rule. Standing alone, the discussion of those sections in the proposed rule is not an agency action and it's not possible to find something in the final action that would actually be challengeable as a final rulemaking with respect to these, you know, these alleged broad determinations. But it is your position that we are to look at the determinations that form the basis of the challenge rule and whether or not those determinations have nationwide scope or effect. Correct. So the actual determinations that were part of the rulemaking is what we look to to determine nationwide scope or effect. That's correct. And in this case, the determinations upon which the actions were based were all fact specific to Texas, and you can see this numerous times in the language that EPA uses in the Federal Register. For example, they said the reason they hadn't disapproved other consultations in the past is that the particular facts of this situation for Texas and Oklahoma did not arise. That's on page 313 of the Federal Register. Okay. If we ask the EPA, explain which of those have a nationwide scope or effect, and they say, well, they all do, and they don't get specific at all, do we give any deference to that statement by the EPA? The standard of review for Section 307B1 should be de novo because this is a jurisdiction and venue provision, and this court is better positioned to make such determinations. Is the determination a fact-finding or a ruling of law? So in this case, EPA has not offered fact-finding. This is not a case where we're arguing about whether the effects of the rule are an effect of pollution traveling one state versus traveling four states, where EPA's expertise might come to bear. Instead, all they've offered is two legal conclusions. One, a mechanistic interpretation that there should be nationwide scope and effect any time two circuits are implicated, and the second, because they say these broad clarifications were put forward, even though they were just never put forward in the final rule. But they're fact-specific to Texas, so I don't see where the two circuits are involved, maybe one circuit, three states. So Texas is the center of the applicability of this rule. To be sure, the eight facilities that are regulated are all in Texas. In Oklahoma, the only thing that the federal implementation plan does there is look at their reasonable progress goal, which is a non-binding target, as EPA has acknowledged on numerous occasions, and they've revised that target, but again, based on what they expect the emissions reduction to be from Texas. So Oklahoma doesn't have to do anything? Oklahoma doesn't have to do anything, and they haven't even intervened in the Tenth Circuit case. That's how little they are interested in this case. The Tenth Circuit case is only the industry petitioners who are also here today, and they all support transfer to this court and think this is the appropriate court. And does any other state have to do anything as a result? They say, in the latest brief, it says something about, well, it has nationwide precedent. Is there any—does California have to do anything based upon this Texas SIP? California does not have to do anything based on this Texas SIP, and the D.C. Circuit has clearly said in the American Road and Transportation Builders case that there has to be something more than sort of a general precedential effect. EPA is overall going to try to act somewhat consistent from SIP to SIP. That's a principle, although they've acknowledged that in the Regional Haze case, in particular, that there can be allowance for some variation among regions, even there. They don't set the same levels for different regions? They don't set the same levels for different regions, and they allow for variation from region to region. And even to the extent that they were to look at what they've done here and have that inform future SIP rulemakings, that doesn't distinguish this from any other SIP, and we know from the language of 307b1 that the default rule is that SIPs will be heard in the appropriate regional circuit, not in the D.C. Circuit. Haven't we previously heard a number of these SIPs? We have. There have been a number of these, and in fact, nationwide scope and effect has not been determined by this court before. Typically there have been some nationally applicable determinations, for example, in the Texas versus EPA case that we rely on in our briefs. But this is the court that would typically hear Texas' SIP challenges, has in the past, is familiar with their unique ERCOT market in Texas, and is familiar with a lot of the underlying facts that are highly relevant to this case. Did the regulations, was there any determination made about grid reliability that would result if these changes were made? I see I'm about to run out of time. Do you mind if I answer the question? You can answer. So EPA dismissed ERCOT's concerns about grid reliability. ERCOT had submitted, along with the comments, a report detailing some of the concerns with grid reliability, and through the declarations you can see that those concerns have remained. EPA simply just dismissed these concerns as unrealistic based on, it's an area that EPA does not have expertise in. FERC is the federal grid reliability expert. They commissioned a report from the Synapse Consulting Company that, as our declarations show, is just riddled with complete misunderstandings of Texas' competitive market, just at the most fundamental level. So they refused to incorporate a reliability safety valve or anything of that nature. All right. Thank you. Thank you. Mr. Gidier. Is that how you say your name? Gidier. Oh, who knew? Thank you, Your Honor. May it please the Court, Stephen Gidier for Luminant Generation Company. I'm also presenting an argument on behalf of the other non-state petitioners and intervenors supporting petitioners in the case. Your Honors, I'd like to address two issues. First, EPA's claim that its finding of nationwide scope is unreviewable and that this Court has no role in determining its own jurisdiction and venue. And second, I would like to address our motion to stay. Your Honor, just like in the second sentence to your question, Judge Elrod, in the second sentence of 7607B, where this Court determines and has determined if an action is locally or regionally applicable, so too in the third sentence, this Court determines whether the nationwide scope in effect. The Court does this without any deference to EPA. There's at least three reasons why EPA doesn't get deference on this question. The first is that EPA doesn't have expertise in interpreting judicial review provisions. That is the province of the Court. These are all purely legal issues. There's no scientific or technical issue where the agency might have some expertise. So categorically, no deference is appropriate. Also, among the discussions we had just a moment ago with Ms. Bennett is what are the relevant determinations here? And to the extent the EPA has announced in the Federal Register that determinations are new interpretations of certain sections of the Clean Air Act and interpreting multiple complex provisions of the Regional Haze Rule, it does seem to me they have expertise on whether those determinations have nationwide scope, whether they will impact the way we make similar determinations on similar issues in other states. Isn't that expertise relevant here? Well, Your Honor, EPA surely has a role in the second clause to make and find and to tell you whether they think they made such a determination. Well, they have a role in both clauses, it seems to me. It's the determination in the first clause that we're reviewing here under your discretion, and they very much do have expertise regarding the effects. They may be wrong, and that's what you're arguing. I'm not disputing whether you can show they're wrong or not. But I'm just wondering about your saying there's no – I mean, it's not necessarily to say there's any deference, but it's another thing to say there's no expertise. What is our standard of review on their determination that this has nationwide scope? Wherever we find it – Because it involves a jurisdictional provision, as they contend, or just judicial review provision, it's de novo. There's no deference that's appropriate in this case. Did they make any determinations? No. An interpretation – The question says, should we defer to their determinations that nationwide – are there any actual determinations that say that it's a nationwide or that it would impact the nation? No, Your Honor. Interpretations are not determinations. As Ms. Bennett was saying, the determinations in this rule are things that have operative effect with respect to Texas. And, in fact, one of these so-called interpretations where EPA says a state has to consider four factors for outside the state doesn't even apply to Texas. EPA says in page 309 of the final rule that Texas, in fact, did that. So these interpretations really have nothing to do with the ultimate determinations, which are under the facts of the Texas Civ that EPA thought that that was inadequate. So even if there was some deference to determine the determination stage, there's nothing in the determinations that's nationwide? Is that your position? Yes, Your Honor. And you have to be careful between the determination and the finding, which I think is what this court was getting to in its initial questions. EPA's finding – What are the specific determinations? That's the question. Right. The specific determinations in this rule are that Texas's Civ was inadequate and that a Civ was required. The interpretations that EPA offers of its regulations, which, by the way, the only time it's been said that those are legally binding on anyone has been in the briefs of counsel. Nowhere in the rule did EPA say that those interpretations are legally binding on anyone. That appeared for the first time in their brief. So that's not entitled to deference because it's post hoc. There's also no deference under these facts because EPA has offered wildly conflicting and inconsistent positions. EPA says two circuits is dispositive, but we pointed to the Michigan-Minnesota example where there were two states and two circuits, and EPA supported review in the regional courts. Just last week, EPA issued another Clean Air Act rule involving Ohio and Indiana. Two states and two circuits, the 6th and the 7th, but EPA found again that review was appropriate in the regional courts of appeals. And they did that in Minnesota and some other states? Michigan? Yes, Your Honor. Michigan and Minnesota. So are we the only one that they've said it's nationwide? Absolutely. We're being . . . Texas is being treated as the exception here in the entire history of the regional Hays Program, and the Texas and Oklahoma SIPs are last for the first planning period. EPA has never done this before. These cases have proceeded as a matter of course in the regional courts of appeals, and as we decided . . . By we, I mean this case. This case is the only one. So even though there are other intra-circuit that have adjacent states that are affected, this is the only one that's being told it's nationwide? Yes, Your Honor. This is the first time EPA has made that finding in the regional Hays context. What do you say to someone who says that once the EPA publishes its finding, only the D.C. Your Honor, there's no basis for that argument in the statute. Just like this court decides under the first two sentences whether it is locally or regionally applicable or is nationally applicable like this court did in the Texas versus EPA PSD case, so too this court decides that it is based on a determination of nationwide scope and effect or is not. Can you win if the determination and the publication are collapsed into one element as the EPA does? Can you still win? Absolutely we can, Your Honor. How? Because if the determination, if the two-circuit and the binding effect are somehow the focus and this court even has to defer to those, those are wholly unreasonable. They're not supported by the statute. We pointed that out in our brief. So under any standard of review, we think that this court should keep the case. Now, I would like to address our motion to stay, if I may, if you have no further questions on the transfer. Your Honors, this is a $2 billion rule. $2 billion with projected benefits by EPA that are so small that no one will be able to see. Our declarations establish that hundreds of millions of dollars will be needed to be spent while this case is on review and EPA doesn't dispute that. They just quibble with the amount. Those costs cannot be recovered. The state has established harm in several ways, risk to the RCOT grid, as this court noted, and also cost to rate payers and to the state from having to make the transmission system upgrades. Does our circuit precedent allow us to consider costs? Because normally, you know, if you're doing an injunction, if it can be monetarily recovered, we say no, we won't give it. This is not like that, is it? No. In the Enterprise International case, Your Honor, this said that it's not so much the amount of the harm but the fact that it's irreparable. Here, there's no dispute that these costs cannot be recovered from EPA in this case. Is there evidence in the record that some plants will close as a result of this? Yes, there is. In this case, RCOT found that between 3,000 and 8,000 megawatts of generation in RCOT market would be forced to close. Now, we haven't identified a particular plant or a particular date. That's EPA's argument of when a plant would close, but it's indisputable that these costs, given the current state of the market, would require some units to close. Now, EPA argued in the—I see that I'm out of time. Go ahead. EPA argued similarly in the Clean Power Plant case where the Supreme Court issued a state earlier this year. In that case, the compliance deadline was 2022, a year further than in this case. EPA's brief to the Supreme Court said, look, the compliance deadline is so far out, nobody's going to close their plant while this case is on review, but the Supreme Court was not convinced by this argument. I think this Court should not be either. Thank you. All right. Thank you. Save some rebuttal time. Yes, ma'am. Thank you. I'm not even going to try your name. Magumfar. I like to say it's surprisingly phonetic. May it please the Court, good morning. My name is Dustin Magumfar. I represent the United States. With me at Council table is Brian Tomasovic from EPA Region 6, Office of Regional Counsel, and Matthew Marks from EPA's Office of General Counsel. If the Court would permit— Are all five lawyers from D.C.? No. We have D.C. and Dallas from EPA, and then the other two gentlemen are with Intervenor Conservation Groups. That's a lot of lawyers. A lot of parties. It's a very full courtroom today. If the Court would permit, as the move-ins on EPA's motion to dismiss or transfer, I would like to reserve two minutes of rebuttal just on that motion. You don't get rebuttal. Very well, Your Honor. I would actually like to start directly with some of the questions that have been asked already this morning. One of the first questions was, what is the determination, or what are the determinations that are at issue here? The determination is EPA's clarified interpretations of statutory and regulatory provisions about the responsibilities and roles of upwind and downwind states when it comes to the transportation of haze across state lines, which is at the very core of the Regional Haze Program. Now, much has been made in Texas's letter brief and in their argument this morning about specific determinations about, for example, Texas's four-factor analysis and why that was insufficient, and EPA found for seven independent reasons that it could not approve that analysis. But at the issue that is presented by EPA's motion to dismiss is that EPA, because of the intricacies between Texas and Oklahoma, the fact that Texas sources, if you controlled every point source in Oklahoma, Oklahoma, the Wichita Mountains would still not be able to meet its reasonable progress goals without some contribution from Texas. So this is very intertwined between the two states. EPA looked at that consultation. They saw the problems. They saw the fact that Oklahoma had not thought it could request any reductions from Texas. They saw the fact that Texas had not... Weren't the reasonable goals being met? Your Honor, I have several points in response to that question. First, with respect to the monitoring data that has been pointed to in the briefs, that was based on meteorological conditions that are not expected to continue. It's not based on permanent and enforceable emission limitations. But more importantly, that metric really looks at the wrong question. But is the answer to the question yes? No. Based upon the metrics that we have in the record? Is there anything in the record that says the reasonable progress goals were not being met? Yes, Your Honor. And what is that? First, it's important to remember that the reasonable progress goals set in EPA's FIP only reflect the emission reductions that will come about from the scrubber upgrades. They don't reflect the emission reductions that will come about from the scrubber retrofits, which will come online later, and which is more than double the amount of emission reductions. I'm not talking about what will happen after 18. I'm talking about during the relevant time period. The relevant time... Are they already meeting the goals during the relevant time period under the governing requirement? No, Your Honor. Because those goals, to understand the reasonable progress goals, that flows from the four-factor analysis. So you determine what reasonable progress can be made during the planning period. The goals are then just a snapshot in time that says, okay, by 2018, this is what we expect. And by 2018, everything was met. By 2018... Isn't that right, that the record... The only evidence in the record shows that by 2018, everything that was met that needed to be met by 2018? Maybe I'm wrong on that. I'm happy for you to correct me. In fact, I defer to you on the record for you to correct me on that. There is abundant evidence in the record about the proper way to understand and measure visibility benefits in a regional Hays rulemaking, as has been affirmed by the Eighth Circuit in the North Dakota case. I'm just asking a simple question. Where in the record do I go to say that the goals weren't being met that were for 2018? Where in the record does it say that the goals that needed to be met by 2018 were deficient in less than that? If you look at our opposition to the joint motion to stay on page 24, we have citations to the record that explain why their argument about the monitoring data doesn't actually show that the goals were going to be met by 2018. No, no, I'm asking where is your monitoring data that shows that it wasn't met? EPA doesn't have independent monitoring data. So there's no data that contradicts that in the record? Your Honor, respectfully, it's not the correct question for understanding the visibility benefits that will come from the emission controls. If I may have a moment to explain. EPA compares the visibility benefits that will be achieved against natural conditions because the goal, the national goal set by Congress, is to achieve natural conditions for visibility in these parks. Okay, but can I just make sure I understand, your position is not that there is other data in the record that contradicts that data and that therefore we should defer to your data. Your position is that you don't have to show that that's not even relevant or we don't need to know whether the 2018 levels have been met. My position is that deference is owed to EPA's review of that data and conclusion that that was not sufficient to overturn the analysis, the four-factor analysis, EPA's own analysis of the four factors in its FIP and determination that controls were reasonable and necessary in order to make reasonable progress. And that determination is owed to us. You're saying it's not a relevant factor whether or not the 2018 goals have been met. They haven't been met yet because we haven't even gotten to 2018, your Honor. And it's already that clear. It's a progressive, it's a reasonable progress goal. Right, it's a measure of... Is it on track? That's what she's asking you. Do you have evidence that it's not on track, that it's not going to be accomplished? The problem with the meteorological data, even if accepting that it shows, I mean that the monitoring data shows what it shows, the problem is that was not expected to continue because it was based on meteorological conditions. So it may have been true at that moment in time when that monitoring data was collected that it appeared that the reasonable progress goals would be met. But once that was based on several factors, including the recession and reduced emissions, it was based on the meteorological conditions at the time, it wasn't based on enforceable permanent reductions in emissions. So that could change if emissions ramped up, if the weather patterns changed, then the monitoring data could have changed and shown that it wouldn't meet the 2018 reasonable progress goals. And I didn't mean to get you off track. You were trying to make another point entirely. I apologize for the digression. Not at all, your Honor. Thank you. To go back to the question of what is the determination, EPA's clarified interpretations of these provisions of the statute and the rule that speak to what the responsibilities of upwind and downwind states are can't be divorced from EPA's analysis of Texas and Oklahoma's submissions. EPA recognized the situation, said it's apparent to us that it's necessary for us to clarify interpretations to provide guidance to all states on what the respective roles and responsibilities are, how these provisions of the statute and the regulations work, and then they applied it here to Texas and Oklahoma. But the fact that the only sources that are regulated by the FIP in Texas is of no moment to the fact that this rule is based on a determination of nationwide scope or effect. If a rule that only regulated directly sources in one state, if that was dispositive, then that provision of the statute would be impossible to ever meet. There would never be a case that would be locally or regionally applicable but based on a determination of nationwide scope or effect. Actually, Luminate cites a contrary case in its brief in a footnote from another jurisdiction. I could pull it, but do you know what I'm talking about? In response to your it could never be the case, they say actually it is a case and here is the case. And I don't have it handy, but maybe— I'm afraid I don't. Okay. I'll find it, though. Let me ask you more generally. You're talking about how the statute, if it's read a certain way, would be sort of a moot point. Where is—do you get from this language that we're talking about in 7607, subpart, that we have no right to review? It seems to me your briefing does accept that there is a determination necessary by the state based on a determination that has nationwide scope and then that determination has to be published. I could see where we don't review whether it was published or not, but why do you get the inability to review whether it was published or not to a lack of ability to review the underlying determination, which is usually court business, of whether in fact a statute has been properly applied to a set of facts? To clarify, Your Honor, our position is that the court could review whether it's been published, and the Eighth Circuit recently did exactly that in a case called Lion Oil, where the court said, EPA, you didn't publish that it was found—the finding, and therefore you didn't do it, right? Okay. I overstated. But it's a fairly simple matter to determine if it was published or not. Correct. No, absolutely. I do think we do need evidence to show it was published, so I take back that it's nonreviewable. But whether it should have been published is not on that part of the two clauses of this section. It seems to me that's not something we're viewing, whether they should have published that. But why do you get from the very limited review, can we find the document, of the second clause of 7607 sentence that we're dealing with, how do you pull back into the first clause that we can't review the underlying determination? You need a ruling. I don't know if you disagree with what Ms. Bennett said, that you need the ruling, the that that ruling needs to be based on, needs to be derived from a determination that has nationwide scope or effect. Why would that not be reviewable? Well, a couple points, Your Honor. First, we don't agree that a court has to make a finding that the rule is based on a determination of nationwide scope or effect, and we think there's no support in the plain language of the statute for that point. And to the extent that dicta and a footnote from a D.C. Circuit case in 1985 suggested otherwise— I'm not terribly concerned about dicta and footnotes. What I'm concerned about is the language of the statute, and it's a fairly straightforward kind of language, one of the most confused statutes I've written, but I've read, but nonetheless, it's talking about determinations by agencies of a certain kind. We review those all the time. Our position flows from the fact that because of nationwide scope and effect is ambiguous and there is no meaningful standard in this context with which to review it, that's what our position is. But more importantly here, even assuming the court can review it, and I would point the American Road Transportation Builders Association, I think is what it's called, I refer to it as ARTBA, but the decision by Judge Kavanaugh in the D.C. Circuit where EPA made the same argument there, and Judge Kavanaugh said, we don't have to decide that. Even assuming it's reviewable, it would be reviewable under the APA's arbitrary and capricious standard, and there the court went on to find that in that case EPA had not made such a finding, and the court found that reasonable. Here the court can follow the same path and say, we don't have to decide whether it's reviewable because on its face what EPA did here is in fact reasonable and is not arbitrary and capricious. I mean, there's certainly no support. EPA has never attempted to say that it is seeking to determine the jurisdiction of the court. EPA is doing what Congress set forth for it to do in Section 7607, which is look to its own rulemaking. Oh, I thought you were arguing that you can determine that we don't have jurisdiction out of hand without us even being able to consider whether we have jurisdiction. I thought that was the initial point in your first brief. We argue that the foreign provisions are jurisdictional, and thus that this court does not have jurisdiction, but that is a consequence of the scheme that Congress has set forth.  There's certainly authority suggesting that the court can look at facts necessary to determine its own jurisdiction, but our point would be that it doesn't, that's another question the court need not decide because whether it's jurisdictional or whether it's a mandatory venue provision, the outcome is the same, that transfer at a minimum is required. We would create a circuit split if we were to find that it was jurisdictional rather than a mandatory venue provision with the Dalton case, wouldn't we? The D.C. Circuit has held that the foreign provisions are a question of venue, that's right. So, are you arguing very strenuously that it's jurisdictional then, or are you really saying it's venue and we should move on and say it's venue? I am saying that the court doesn't have to decide that question, as it did in Texas v. EPA, one of them, the one that, the thorough opinion from several years ago. Okay, I want to make sure that you have enough time to tell us whether one of the determinations that form the basis of the challenge rule has nationwide scope or effect, and if so, which one of those determinations, or maybe there are more than one. I want, please, could you please go through the determinations and tell us which ones have nationwide scope or effect of the actual determinations that are part of the rulemaking. I would disagree with that framework that it's a, you know, each particular decision on a different element of the Texas SIP. The core determination that the rule is based on is EPA's clarified interpretations of several provisions of the statute and the regional Hays rule. That was applied to multiple SIP elements that Texas had to submit. If we use that framework, what is the answer to my question? The disapproval of the reasonable progress goals, the disapproval of the long-term... That's right, disapproval of the reasonable progress goals. The disapproval of the long-term strategy. Those are determinations that form the basis of the challenge rule that have nationwide scope or effect. Again, I would... Is that correct? I would argue you cannot divorce those determinations, those specific actions on Texas's SIP from EPA's clarified interpretations. You cannot look at one of them in a vacuum. Okay, but if we believed we could, I'm trying to see how you win, and that's what I'm asking you, to tell me all the ones that you think you win on. Those are certainly... Those are the two. There may be others that I'm not picking up in this particular moment, but certainly those are the core pieces of what EPA disapproved. But certainly we're not trying to put you on the spot where you have to think of them on the moment because that's in the other side's brief that that's how you do the test and that sort of thing. Relevance is the argument by opposing counsel in briefing that this is the last of phase one of the regional Hays rule implementation. And so whatever was done to clarify, well, have no nationwide impact, in fact, because nobody else has, no other state has this left to be accomplished. Do these determinations apply to the next phase as well, or do you not... Let me just let you answer the question. Both. As we explained in our letter brief, there are further actions that have to be taken in the first planning period that these clarified interpretations will certainly play a role in and will influence. It's also true that they will influence and guide the states and EPA in review during the second planning period. Okay, let me ask you. I think you've answered that question. Let me ask you a different question. It's in your letter brief. It does seem to be not intuitive. Let me ask you if you're willing to stand by it here. That's a funny way to preface the question, baby. But there is language and comment in legislative history that two circuits is enough. In that case, I asked the clerk to look this up. I hope I remember what he told me. Six states in the Tenth Circuit, three in the Fifth, nine circuits is nationwide. I mean, does that really hold up as a consistent interpretation of what nationwide means, the mere fact it's two circuits? We believe that our position is that the legislative history there on that point, that if multiple judicial circuits are involved. Legislative history is one comment, is it not? Yes, it is a comment. Right, there is a particular comment. But it is consistent with Congress's intent to centralize questions that have potential national applicability or nationwide scope or effect in the D.C. Circuit. So I would argue that the point with the multiple circuits is that it could result in inconsistent rulings by the different circuits and result in a circuit. Word is still nationwide, not focusing on inconsistency. It's of nationwide scope and effect, however, in the context of a locally or regionally applicable rulemaking. So if it had to literally regulate across the country, and I would argue that not even a nationally applicable rule has to apply across the country to be found nationally applicable, then it would collapse those two prongs. And if I may briefly respond to the point about there's been some discussion this morning about other cases that have not been involved in multiple circuits, but EPA has not made such a finding. And I would make two points in that. First, the fact that EPA has the discretion to find that a rule is based on a determination of nationwide scope or effect does not mean that they have to do it in every instance. And there's support for this in the Dalton Trucking case of the D.C. Circuit. But more importantly, and to use the Michigan-Minnesota Taconite rule as a specific example, that case involved the determination for a couple of facilities in a fairly unique industry in one part of the country of whether a certain type of control was technically feasible at those specific facilities. So there was no reason for EPA in that case to find that that rule was based on a nationwide scope or based on a determination of nationwide scope or effect when it only had scope or effect on those two particular Taconite facilities. Whereas here, this interpretation is going to guide all of the states moving forward in understanding the roles and responsibilities for visibility transport. I do have a question. Yes, Your Honor. The Clean Air Act mandates that the EPA consider the energy impact of compliance with the regulations. The petitioners argue that the final rule would force the closure of a lot of generating capacity, including 12 percent of peak summer demand for RCOT. Can you direct me to the portion of the published final rule that estimates the refining capacity that the rule will close and EPA's explanation of how this will impact or not impact RCOT's grid reliability? It gets very hot in Texas in the summer. We might have a lot of people complaining. Your Honor, I believe you said something about refining capacity specifically. No, that estimates the refining capacity or just the capacity that the rule will close and EPA's explanation of how this will impact RCOT's grid reliability. Grid reliability is one of the considerations that you're supposed to consider under the mandated Clean Air Act and under the mandates of the Clean Air Act. Where did you do that? And how is it being taken care of if 12 percent could be taken offline? That's a lot of power in the summer in Texas. I have a few points in response to that, Your Honor. First, very specifically, and then a couple of related points. In terms of analyzing the reliability, so Texas submitted comments during the rulemaking raising concerns about possible impacts of the FIP on the reliability of RCOT and the grid. And in response to those comments, EPA retained a nationally recognized firm with absolute credentials and expertise on these issues in Synapse who do have familiarity with RCOT, regardless of what Texas has said in response. Synapse did a very thorough report and analysis of the evidence that was submitted by Texas during the rulemaking and disagreed with the conclusions that there would be any impact on reliability from this rule. Is that in the published final rule that specifically details that? Yes, it is, Your Honor. It's also in the response to comments. It tells what the impact would be on RCOT's reliability. That's in the published rule. EPA, right, EPA relying upon its experts, which the Supreme Court has said that EPA must have discretion to rely on its qualified experts even if there's disagreement with the other side's experts.  Relying on the report by Synapse that said that they found that there was no reason to believe that there would be reliability. So it's EPA's position that it's not going to affect grid reliability. That's correct, Your Honor. Okay. That's correct, Your Honor. And the reason is, well, that was part of, that was in the rulemaking what EPA found was that Texas had not shown that there would be impact on the grid reliability and there was no other evidence submitted to suggest that it would. Now, here in the context of the motions for stay, at the heart of the reliability argument is really the argument that sources are going to have to retire, and that's what's going to have impact on the reliability because sources are going to go away. The problem is petitioners have submitted nothing more than pure speculation about the possibility that the long-term economic viability of these plants may be impacted by the final rule. Even the declarations submitted on reply by Texas say that it's, quote, simply not possible at this point to know the precise units that may retire and in the other that ERCOT does not know at this time which units may be retired as a result of the regional haze fit. The declarations that we submitted show that there are substantial economic pressures that preexist this rule and that are going to continue to impact the viability of these coal units. So to show irreparable harm, it has to be showed that this rule is going to cause shutdown and, more importantly, during the pendency of judicial review. And where there is nothing more than speculation about long-term impacts on these sites, it certainly doesn't support that there is an imminent harm during judicial review based on retirements. And without that threat to retirement, there is no argument to show that there's impact on reliability. And further, our declaration showed a number of ways that ERCOT, A, has already made massive investments in its transmission capacity by virtue of the fact that a substantial amount of renewable and natural gas power has been coming online in ERCOT, and, two, that there are plenty of options to deal with reliability and transmission impacts short of constructing huge new transmission lines. All right. Thank you. You've answered the question. Thank you. Gerhard, you have three minutes. Please give Texas and Lumen five extra minutes because of this excess. Yes, sir. May it please the Court. Matthew Gerhardt for intervener respondents. Judge Elrod, I want to provide the citation to your questions on reliability. So it's 81 Federal Register 345 is where EPA in the final rule made its findings about energy and reliability impacts, and that's where the synapse report that counsel discussed is mentioned as well. Unless the Court has questions, I'm going to address the stay motions only. Petitioners have talked to you about the costs from the rule, but the stay factors require them to show that the public interest favors granting a stay, and it also requires the Court to balance the harms to the parties. And what the petitioners haven't talked about are the benefits of the rule. We submitted a declaration from Dr. George Thurston, who's a noted public health expert, and Dr. Thurston put a price tag on the public health benefits from this rule. He calculated that the benefits are more than $3 billion a year. I'm confused about the applicability of the public health benefits. Don't we already have the NAAQS for that? And so why it seems like the whole purpose of the Hays is to preserve our beautiful Big Bend and Guadalupe Mountains and the Wichita Mountains, not to do with public— you've already got the NAAQS and the Clean Air for that. So it seems like you're conflating the two by bringing up those public health benefits. Your Honor, you're correct that the primary intent of the Hays provisions is to address visibility. But in the context of the stay motion, what matters is the public interest and the actual practical effects of the rule. So regardless of what the intent of the rule is, there are significant practical impacts on health. And the reason for that is that the same emissions that obscure visibility also form articulates that people breathe, which cause a range of health effects. And this study, does it demonstrate that these would be realized during the portion of the time that the court would be reviewing this? Because it's my understanding it's a tiny, tiny difference that's not visible to the eye. Is it linked to show that it would be during the relevant time of the court review that these health benefits would be realized? Yes, Your Honor. And that's with that particularity? Yes, Your Honor. If you look at the declaration that Dr. Thurston submitted, which was attached to our response to the stay motions. And I have read it, but I'm just trying to clarify. You believe that that's particular enough? Yes. And that those tiny, tiny differences would make that difference in that relevant time period, which is a short time period? Well, Your Honor, the visibility impacts and the health impacts are separate. And we're talking about 230,000 tons of sulfur dioxide. And regardless of what magnitude of visibility benefit that results in, as a health matter the consequences are enormous. So you're saying please take that in consideration in deciding the stay. It's not dispositive, but it certainly should be considered. Yes, Your Honor. Thank you. Thank you. Rebuttal? And it's only rebuttal, but you probably know that. Yes. Luminant is the only one that had reserved rebuttal. Well, with the added time we thought it would be helpful to have both of us rebut, but if you'd prefer just Luminant to do it, that's fine too. You're getting the excess, not him. I'll take the excess. I wanted to specifically address some of the reliability comments that were just made by EPA. First of all, EPA cannot second-guess the reliability organization that is charged by law with assessing reliability matters, and in this case that's ERCOT. And ERCOT did submit reports to EPA that were just dismissed out of hand. EPA, furthermore, would not receive any deference when it doesn't have the expertise to verify the accuracy of the expert report it commissioned. FERC is the only federal agency that has expertise in reliability. So that's the Marsh case that says, you know, you can commission an expert, but if you don't have the expertise to verify that that's right, you know, why are you deferring to that synapse report as opposed to the agency that is charged by law, ERCOT, with this? And as this case has developed and ERCOT has undergone more of its long-term planning, they're continuing to find that there will be a number of shutdowns from this. And the most recent report that I cite to you, that the state of Texas cites in the letter brief, further solidifies that their models suggest there will be widespread closures based on this rule. Now the EPA argues that it has about half a dozen grounds for disproving the Texas SIP. In order to obtain a stay, do the petitioners have to show that each of the grounds is unreasonable, or can the petitioners obtain a stay merely by showing that the FIP is beyond EPA statutory power? Well, there are two points on that. First of all, EPA references in its brief having numerous reasons for this, but they don't rely on those reasons in their briefing, and so this court should not rely on those reasons either. Furthermore, in the final rule, they do list off a number of reasons, but many of them hinge on these same issues that are kind of common throughout. For example, Texas looked at sources in the aggregate and said, you know, all the sources taken together are not going to have a perceptible visibility benefit to Big Bend and Guadalupe Mountains. Texas did not look, therefore, source by source, whereas EPA says Texas had to do a source by source determination. That's unsupported in the statute. Source by source is necessary for BART, another part of the Regional Haze Program, but it's never been required for reasonable progress. And that difference of opinion and that preferred EPA interpretation underlies multiple of their supposedly independent reasons for disapproval here. So they have not shown that those are actually severable reasons that would independently of the arguments that we've made in our briefs be enough to strike down the various portions of this SIP. All right. Thank you. Thank you. Your Honor, to address your last question, the second merits argument that we make in our stay motion, that EPA acted outside the planning period is sufficient to vacate the rule and certainly sufficient to support the stay order. The relevant time period is 2008 to 2018. That's defined by the regulations. All of the control measures that EPA is imposing in its unlawful FIP happen after that period. Council said that their 2018 goal takes into account emission reductions in the rule. That cannot be the case. They all take effect 2019 or later. So that ground in and of itself is sufficient. We cited to the court the definition of a FIP, which is only to fill the gaps in a state plan. EPA does not respond to that argument at all in its briefing. To the point about the goals, all of the goals are met. There is no contrary evidence in the record. EPA says in the Federal Register on page 341, we acknowledge that recent monitoring data from improved monitors, those are monitors that EPA helps oversee, indicate that the more recent five-year average measurements of visibility at Texas and Oklahoma areas are lower, indicate better visibility conditions than the numeric reasonable progress goals we are establishing. That is undisputed in the record. Council said that's because there's meteorological issues. But in the proposed rule, EPA says this is due to, quote, reduction in the impacts from SO2 emissions, close quote. That's at page 74843. So the only evidence in the record is that the goals, which we're trying to get in 2018, are already met. There's no reason for the stringent new costs that EPA is imposing. Now, let me also address the interpretation determination issue. An interpretation is not a determination. The determination is what EPA did with respect to the Texas rule. And, in fact, Council said, I think I wrote this down correctly, that its interpretations can't be divorced from its action on the Texas SIP. That is exactly right. These are intertwined issues to the extent EPA made any interpretations. They're only relevant to the extent it applied those to the Texas SIP. Now, even if EPA did make some broad pronouncements about its regulations, those are narrowly cabined. The first planning period is over. That's what EPA said in the rule. It's already acted on all state SIPs other than Texas and Oklahoma for the first period. EPA now points to a few cleanup actions that it's saying, oh, the first planning period is not over yet. We have more to do. But if you look at those rules, all of those rules deal with the BART requirement. None of them have anything to do with reasonable progress. So if these new pronouncements were so significant and of national importance, you would think that EPA would have mentioned them in those new rulemakings. And in the future, EPA is promulgating new regulations, specifically for the purpose of incorporating these interpretations into the actual regulations, which is what they should have done in the first place before they attempted to subject Texas to them. On the legislative history, Your Honor, the legislative history does not actually say that two circuits is dispositive. Of course, the statute doesn't mention circuits at all. The legislative history simply discusses situations where scope or effect may extend beyond a single circuit. So it's ambiguous as to what that means. And certainly there's other, we pointed the court to other language in the legislative history that talks about SIPs being reviewed in the regional courts of appeals. And that's what we think the court should do here. Thank you, Your Honor. That concludes the DACA for today. Thank you very much. We're in recess.